(June 13, 2013)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JEFFREY E. ALNUTT, Appellant. [968 NYS2d 634]—

Egan Jr., J. (1) Appeal from a judgment of the County Court of Fulton County (Giardino, J.), rendered August 19, 2010, upon a verdict convicting defendant of the crimes of murder in the second degree, manslaughter in the second degree, arson in the second degree, arson in the third degree and reckless endangerment in the second degree, and (2) motion to take judicial notice of certain documents.

On December 21, 2007, defendant was the owner of various rental properties, including a building located at 22 Park Street in the City of Gloversville, Fulton County. The property in question was a two-unit residential dwelling located on the corner of Park and Burr Streets. The upstairs apartment was occupied by Gary Romaine and his girlfriend, Deborah Morris, and the downstairs apartment was occupied by defendant's girlfriend, Amber Slaybaugh.[1]

Between 10:00 p.m. and 10:30 p.m. that evening, Thomas Houghton, who was smoking a cigarette on his porch at 16 Park

1. Defendant's wife and family resided in Onondaga County.

Street, saw defendant enter the hallway leading to Romaine and Morris's upstairs apartment. Shortly thereafter, defendant emerged and walked around the front of the residence toward the Burr Street side of the property. At approximately 10:30 p.m., Nancy Keba, who lived across the street from defendant's property, awoke to find defendant arguing with Morris near the front porch of that residence. Keba could hear only portions of the conversation and thereafter returned to bed.[2] At approximately 11:30 p.m., Betsy Houghton (Thomas Houghton's wife and Romaine's cousin) saw defendant—carrying what "looked like a red gas can"—walk up Burr Street onto the porch of 22 Park Street and enter the downstairs apartment. Twenty minutes later, at 11:50 p.m., a 911 call was placed reporting a structure fire at that address, and firefighters arrived to find the first floor of the Burr Street side of the property fully engulfed in flames.

In the interim, Romaine awoke to the sound of neighbors pounding on the exterior door of the residence and was able to safely exit the premises. Upon being advised that Morris was believed to still be inside, firefighters twice attempted to gain access to the upstairs apartment—only to be turned back by heavy smoke and heat so intense that it damaged their helmets and thwarted their attempts to locate Morris through the use of a thermal imaging device.[3] The fire ultimately spread to the upstairs apartment, where Morris's severely charred body was recovered early the next morning.[4] During the course of the ensuing investigation, a state fire official discovered "a piece of melted [red] plastic in the debris" in the dining room of Slaybaugh's apartment that "was consistent with . . . a gasoline container."

Defendant thereafter was indicted and charged with murder in the second degree, manslaughter in the second degree, arson

---

**2.** According to Keba, she heard Morris say, "Don't do it." Calli Barnes, who lived at 17 Park Street, also testified that she saw defendant talking to Morris that evening—although Barnes estimated that this conversation occurred between 11:00 p.m. and 11:30 p.m. Like Keba, Barnes could not overhear the entire conversation, but she testified that she heard defendant tell Morris that "he didn't have a choice."

**3.** The captain of the Gloversville Fire Department testified that a fire of this magnitude was unusual within the city limits, as the department's response times generally limited the damage resulting from a structure fire to "a room and contents kind of thing." Here, despite the fact that the firefighters were at the scene "between one and two minutes fully geared and ready to go," the fire at 22 Park Street already "was burning hot."

**4.** A subsequent autopsy revealed that Morris died as the result of "asphyxia due to smoke inhalation and the inhalation of heated products of combustion," and her manner of death was classified as a homicide.

in the second degree, arson in the third degree and reckless endangerment in the second degree. Following a lengthy jury trial, defendant was convicted as charged and sentenced to an aggregate prison term of 25 years to life.[5] Defendant now appeals.[6]

We affirm. Initially, we reject defendant's numerous challenges to the eavesdropping warrant issued in this matter. Upon reviewing the detective's sworn affidavit in support of the warrant, which referenced statements made by certain identified witnesses, as well as the results of the underlying fire investigation, we are satisfied that the People established both probable cause for the warrant and, further, that traditional investigatory measures were unlikely to succeed (*see* CPL 700.15 [2], [4]; 700.20 [2] [b], [d]; *People v Ross*, 97 AD3d 843, 844 [2012], *lv denied* 20 NY3d 935 [2012]).[7] On this latter point, we note that defendant had worked as a confidential informant for the Gloversville Police Department and, as such, was familiar with, among other things, that agency's surveillance personnel, vehicles and techniques. Additionally, contrary to defendant's assertion, the detective's detailed trial testimony regarding the manner in which defendant's phone calls were intercepted and monitored demonstrated that appropriate minimization procedures (*see* CPL 700.30 [7]) were both established and employed (*see generally People v Floyd*, 41 NY2d 245, 248-250 [1976]). Defendant's remaining arguments on this point—including his assertion that the People failed to timely serve him with notice of the eavesdropping warrant (*see* CPL 700.50 [3]), demonstrate

---

**5.** In the interim, and unbeknown to the jury in this matter, defendant was convicted of arson in the third degree, insurance fraud in the second degree, insurance fraud in the third degree (two counts), grand larceny in second degree, grand larceny in the third degree (two counts), reckless endangerment in the second degree, conspiracy in the fourth degree and conspiracy in the fifth degree after he was found to have set fire in January 2004 to another apartment building that he owned in Gloversville. Defendant was sentenced to an aggregate prison term of 5 to 15 years and ordered to pay restitution; upon appeal, this Court affirmed his conviction (*People v Alnutt*, 101 AD3d 1461 [2012]).

**6.** In conjunction therewith, defendant moved for this Court to take judicial notice of various documents, including a federal indictment charging him with certain crimes and the corresponding judgment rendered in that matter, together with seven pages of orders issued in connection with either this matter or defendant's prior conviction. As all of the cited documents are matters of public record—two of which already are included in the record on appeal—defendant's motion is granted (*see generally Matter of Jeffries v Steiner*, 85 AD3d 1431, 1431 n [2011]).

**7.** The detective's sworn affidavit also provided the reasonable suspicion required for the issuance of the related pen register order (*see* CPL 705.10 [2]).

exigent circumstances with regard to the postponement thereof (*see* CPL 700.50 [4]) and judicially seal the pertinent recordings (*see* CPL 700.50 [2])—have been examined and found to be lacking in merit.

Nor are we persuaded that County Court erred with respect to certain of its pretrial rulings. Although defendant argues—in the context of County Court's *Sandoval* ruling—that the People should not have been permitted to inquire regarding his 1987 bail-jumping conviction, we considered and rejected a similar claim on defendant's direct appeal from his prior conviction (*People v Alnutt*, 101 AD3d 1461, 1463-1464 [2012]) and, for the reasons set forth therein, we again find defendant's argument on this point to be without merit.

Defendant's various challenges to County Court's *Molineux* rulings—to the extent that they have been preserved for our review—are equally unpersuasive. The People's theory of the case was that defendant—facing dwindling resources, mounting indebtedness and growing frustration over Slaybaugh's drug use and threatened infidelity—set the fire in order to collect on his insurance policy; defendant, in turn, suggested from the very start that the fire had been set by drug users or dealers in the community as retaliation for defendant's work as a confidential informant.[8] In our view, evidence of defendant's use or possession of drugs, as well the tumultuous nature of his relationship with Slaybaugh, provided necessary background information (*see People v Burnell*, 89 AD3d 1118, 1120 [2011], *lv denied* 18 NY3d 922 [2012]) and was relevant to any number of recognized *Molineux* exceptions—including motive and intent (*see People v Molineux*, 168 NY 264, 293 [1901]). We also are satisfied that County Court properly balanced the probative value of such evidence against its prejudicial effect and, to that end, gave frequent and appropriate limiting instructions throughout the course of the trial.

Turning to the underlying convictions, defendant's generalized motion for a trial order of dismissal based upon legally insufficient evidence was not "specifically directed" (*People v Gray*, 86 NY2d 10, 19 [1995] [internal quotation marks and citation omitted]) at the deficiencies now being urged and, therefore, this issue is unpreserved for our review (*see People v Townsend*, 94 AD3d 1330, 1330 n 1 [2012], *lv denied* 19 NY3d 1105 [2012]). That said, "our weight of the evidence review necessarily involves an evaluation of whether all elements of the

---

8. Indeed, while the fire was still in progress and before anyone could even assess—much less articulate an opinion regarding—the cause of the blaze, defendant shared this belief with a law enforcement official.

charged crime[s] were proven beyond a reasonable doubt at trial" (*People v Burch*, 97 AD3d 987, 989 n 2 [2012], *lv denied* 19 NY3d 1101 [2012] [internal quotation marks and citations omitted]). Based upon our review of the record as a whole, we find that the verdict is not against the weight of the evidence.

Although defendant is correct in noting that this was a circumstantial case, the proof against him nonetheless was compelling. On the day of the fire, several neighbors observed defendant and Slaybaugh, the latter of whom had just been expelled from a residential treatment program,[9] removing Slaybaugh's belongings from the downstairs apartment at 22 Park Street[10] —ostensibly because defendant had procured an apartment for her in the Town of Tully, Onondaga County.[11] Following an argument regarding, among other things, Slaybaugh's failed attempts at treatment, defendant and Slaybaugh parted company for the remainder of the day. Although various neighbors testified that they did not see Slaybaugh again until after the fire, Keba—it will be recalled—observed defendant arguing with Morris shortly before her death, and Betsy Houghton saw defendant carry what "looked like a red gas can" into 22 Park Street shortly before the fire was discovered.

In addition to the testimony placing defendant at the scene on the night in question, the record also reflects that defendant was under growing personal and financial pressure at the time of the fire. By all accounts, Slaybaugh and defendant had a volatile relationship fueled by drugs and jealousy and punctuated with frequent altercations. Indeed, during a phone call placed on the night of the fire, Slaybaugh told defendant that she "would go have sex with another man if he didn't get [her] drugs." Romaine testified as to defendant's lack of available cash on the day of the fire, and an investigator for the State Police Financial Crimes Unit, who conducted an audit of defendant's business records, testified that defendant's various enterprises and rental properties had suffered a marked decline

---

**9.** Slaybaugh, by her own admission, had a $1,000/day crack habit at this time and had been in and out of various treatment programs throughout December 2007.

**10.** Witness accounts differed slightly as to whether Slaybaugh's belongings were being loaded into the rental van that defendant was driving that day or the garage of the residence.

**11.** Notably, at one point during this process, defendant asked Romaine to find a gas can and get some gasoline for a truck that was parked in the driveway. Romaine's efforts proved to be unsuccessful.

in sales and/or profitability.[12] Additionally, Kenneth Burton, Slaybaugh's uncle, testified that he was present for a November 2007 argument between defendant and Slaybaugh regarding "some financial difficulties," during the course of which defendant said that "he was sick of it all" and "wished [that] all [of] his places would burn."

Finally, the jury was presented with expert testimony as to the results of the cause and origin investigation, which ruled out all natural or accidental causes of the fire. As noted previously, a melted red plastic container—consistent with a gasoline container—was found on the dining room floor in Slaybaugh's apartment, and the state fire investigator testified that there was a "protected area" beneath the container—indicating that "it was sitting on the floor at the time of the fire." Additionally, after washing down the tile floor in the dining room, the floor revealed a blackened, irregularly shaped pattern in the area where the remnants of the plastic container had been found— indicating that the "blackened [area] had been exposed to a greater degree of heat."

To be sure, certain inconsistencies existed with respect to the time line established by the People's various witnesses, and defense counsel's cross-examination of Betsy Houghton revealed issues that could have caused the jury to question her testimony.[13] Additionally, Slaybaugh's mother testified that defendant arrived at her house in the Town of Mayfield, Fulton County at approximately 11:45 p.m.—raising a question as to whether defendant had sufficient time to set the fire in Gloversville and arrive in Mayfield five minutes before the 911 call reporting the fire was placed. The jury, however, was fully aware of the inconsistencies and conflicting proof relied upon by defendant and, further, had the advantage of observing the witnesses and assessing their credibility and/or motives first hand (*see People v Gragnano*, 63 AD3d 1437, 1441-1442 [2009], *lv denied* 13 NY3d 939 [2010]; *People v Casey*, 61 AD3d 1011, 1013-1014 [2009], *lv denied* 12 NY3d 913 [2009]). On balance, we do not find that the jury failed to accord the evidence the weight it deserved.

Nor are we persuaded that defendant was denied the effective assistance of counsel. To the extent that defendant's argument is premised upon counsel's alleged failure to adequately

---

**12.** As of January 2008, defendant's bank accounts collectively reflected a negative balance and, as of February 2008, defendant owed his creditors $457,083.

**13.** As noted previously, Romaine was Betsy Houghton's cousin, and Houghton acknowledged on cross-examination that she made no mention of the red plastic gas can in her statement to the police.

investigate certain issues, this claim implicates matters outside of the record and, as such, is more appropriately considered in the context of a CPL article 440 motion (*see People v Stroman*, 106 AD3d 1268, 1271 [2013]). As for counsel's asserted failure to pursue certain pretrial hearings, we need note only that the failure to make a particular pretrial motion does not—per se—constitute ineffective assistance of counsel (*see People v Carbone*, 101 AD3d 1232, 1235 [2012]). We reach a similar conclusion regarding counsel's failure to object to certain testimony upon *Molineux* grounds. As to the balance of defendant's claim, although defendant indeed is entitled to meaningful representation, he is not entitled to a perfect or error-proof trial (*see People v Jones*, 101 AD3d 1241, 1242 [2012]; *People v Battease*, 74 AD3d 1571, 1575 [2010], *lv denied* 15 NY3d 849 [2010]). Here, despite defendant's protestations to the contrary, the record reflects that counsel made appropriate opening and closing statements, motions and objections, vigorously cross-examined the People's witnesses and articulated a viable—albeit unsuccessful—defense. Accordingly, we are satisfied that defendant received meaningful representation (*see People v O'Daniel*, 105 AD3d 1144, 1147 [2013]; *People v Davis*, 105 AD3d 1095, 1097-1098 [2013]).

Finally, we reject defendant's assertion that the sentence imposed was harsh and excessive. Defendant stands convicted of, among other things, a class A-I felony that resulted in the death of one of his tenants—a death occasioned by defendant's selfish attempt to resolve his financial difficulties through arson. Simply put, upon reviewing defendant's criminal history and taking into consideration the particular facts of this case, we discern no basis upon which to disturb the sentence imposed by County Court. Defendant's remaining contentions, including his baseless assertion of prosecutorial misconduct and claimed violation of the Interstate Agreement on Detainers Act (*see* 18 USC Appendix 2, § 2; CPL 580.20), have been examined and found to be lacking in merit.

Stein, J.P., Spain and Garry, JJ., concur. Ordered that the motion is granted. Ordered that the judgment is affirmed.